## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDRIA ADAMS, HEATHER MONTESANTI and DANIELLE ULSHAFER, individually, on behalf of The Cigna Group 401(k) Savings Plan and on behalf of all similarly situated participants and beneficiaries of the Plan, <br><br> Plaintiffs, <br><br> v. <br><br> THE CIGNA GROUP; THE CIGNA GROUP RETIREMENT PLAN COMMITTEE; and JOHN AND JANE DOES 1-30, <br><br> Defendants. | Case No. <br><br> **COMPLAINT – CLASS ACTION** <br><br><br> JURY TRIAL DEMANDED |

Plaintiffs Andria Adams ("Adams"), Heather Montesanti ("Montesanti"), and Danielle Ulshafer ("Ulshafer") (collectively, "Plaintiffs"), individually and on behalf of similarly situated current and former participants in and beneficiaries to The Cigna Group 401(k) Savings Plan (the "Plan"), by and through their attorneys, hereby allege as follows.

## NATURE OF THE ACTION AND INTRODUCTION

1.      This is a class action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA") for the benefit of the Plan and its participants and beneficiaries. This action asserts claims for breaches of fiduciary duties and other violations of ERISA under 29 U.S.C. § 1132 between June 10, 2019 through the date of any judgment in this litigation (the "Class Period"), against the Plan's fiduciaries, which include: Defendants The Cigna Group ("Cigna" or "Company"), The Cigna Group Retirement Plan Committee (the "Committee"), and John and Jane Does 1-30 in their capacities as members of the Committee

(individually sometimes "Defendant," and, collectively, "Defendants" or "Plan Fiduciaries"). This action is brought to remedy Defendants' breaches of fiduciary duties and other violations of ERISA.

2.     As fiduciaries to the Plan, Defendants were obligated at all times to act prudently and for the exclusive benefit of participants and beneficiaries. However, Defendants utterly abdicated their fiduciary duties to the Class. Specifically, during the Class Period and continuing, Defendants decided to use unallocated Plan forfeiture dollars to reduce Company's employer matching contribution obligations, rather than using those funds to defray Plan expenses, as required by ERISA. They did so to the tune of at least $17 million.

3.     Doing so was disloyal and imprudent and was the result of Defendants' self-interested conduct and dereliction of fiduciary duties.

4.     Plaintiffs bring this action to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches and prohibited transactions described below, and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

5.     The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan filings with the United States Department of Labor ("DOL"), other publicly available documents, and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiffs reserve the right to amend this Complaint as those materials become available in the course of this litigation.

## PARTIES

6.     At all relevant times, Plaintiff Andria Adams, by virtue of her prior employment

with Cigna and prior participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Adams is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

7.    At all relevant times, Plaintiff Heather Montesanti, by virtue of her prior employment with Cigna and prior participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Montesanti is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

8.    At all relevant times, Plaintiff Danielle Ulshafer, by virtue of her prior employment with Cigna and current participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Ulshafer is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

9.    Hereafter any person entitled to receive benefits from the Plan throughout a putative Class Period is referred to as a "Plan Participant."

10.    The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34) and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1003(a).

11.    Defendant The Cigna Group is a global healthcare company with over 70,000 employees worldwide, with a principal place of business located at 900 Cottage Grove Road, Bloomfield, CT 06002. At all relevant times, Company was the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan Fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it appointed members of the Committee and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

12.    Defendant The Cigna Group Retirement Plan Committee is and was, on information and belief, at all relevant times during the Class Period, located at 1601 Chestnut Street, TL15, Philadelphia, PA 19192. At all relevant times, Defendant the Committee was the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and Plan Fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets.

13.    Defendants John and Jane Does 1-30 are unknown individuals comprising the Committee or any other relevant Plan committees; any officers, directors, or employees of Company; or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiffs reserve the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained. The Committee and John and Jane Does 1-30 will be referred to collectively as the "Committee."

## JURISDICTION AND VENUE

14.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001, *et seq*.

15.    This Court has personal jurisdiction over Defendants because at all relevant times, including during the Class Period, they transacted business in this District, reside in this District, have significant contacts within this District, and because ERISA provides for nationwide service of process.

16.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, the Plan is deemed to reside in this District, some or all ERISA violations alleged herein took place in this District, and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### FIDUCIARY STANDARDS REQUIRED UNDER ERISA

17.     ERISA was enacted to protect the interests and benefits of employee benefit plan participants and established very important minimum standards for the conduct of plan fiduciaries.

18.     In fact, the strict fiduciary standards and duties of loyalty and prudence required of plan fiduciaries by ERISA are among the "highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (citation and quotation marks omitted).

19.     The strict fiduciary duties of loyalty and prudence apply to the fiduciaries of retirement and health and welfare plans governed by ERISA. 29 U.S.C. § 1104(a)(1) provides in relevant part that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-
>
> (A)     for the exclusive purpose of:
>
>> (i)  providing benefits to participants and their beneficiaries; and
>>
>> (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

* * *

(D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA with exceptions not applicable].

20.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

21.    Under ERISA, fiduciaries who exercise any authority or control over plan assets or the administration of a plan must act prudently and for the exclusive benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that the amount of fees paid from plan assets are no more than reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also id.* § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan" and shall not inure to the benefit of the employer).

22.    Congress also recognized that certain types of transactions are susceptible to abuse by fiduciaries. As a result, Congress enacted Section 406 of ERISA. Section 406(a) prohibits ERISA plan fiduciaries from causing their plans to engage in certain specific transactions with parties-in-interest. In pertinent part, ERISA Section 406(a) provides in relevant part:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect-

(A) sale or exchange, or leasing, of any property between the plan and the party in interest;

(B) lending money or other extension of credit between the plan and a party in interest;

6

(C) furnishing of goods, services, or facilities between the plan and a party in
    interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any asset
    of the plan;

29 U.S.C. § 1106(a)(1).

23.     Congress also recognized that ERISA fiduciaries, by virtue of their responsibilities, would have ample opportunity to engage in transactions whereby they: (1) engage in self-dealing with plan assets; (2) act as fiduciaries to the plan in the transaction while also representing or acting on behalf of other parties to the transaction whose interests are adverse to the plan, its participants, or its beneficiaries; and (3) receive consideration from any party to the transaction for performing the transaction.

24.     Therefore, in Section 406(b) of ERISA, Congress flatly prohibited, with no exceptions, transactions whereby an ERISA fiduciary engages in a transaction (1) that is tantamount to fiduciary self-dealing, (2) in which the fiduciary has a conflict of interest, or (3) in which the fiduciary receives consideration (i.e., "kickbacks") for executing the transaction. The statute provides that:

A fiduciary with respect to a plan shall not—

(1)     deal with the assets of the plan in his own interest or for his own account,

(2)     in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

25.      "Section [1106](b) prohibits a plan fiduciary from engaging in various forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J.) (quoting H.R. Rep. No. 93-1280 (1974)).

26.      According to DOL, ERISA's Section 406(b)'s

> [P]rohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

29 C.F.R. § 2550.408b-2(e)(1).

27.      Under the plain language of the statute, the duties of loyalty and prudence imposed by 29 U.S.C. § 1104(a)(1) require that when fiduciaries are presented with alternatives (in conduct or interpretation), the fiduciaries must choose the alternative that solely considers the interests of plan participants exclusively to fulfill the requirement to both (1) provide "benefits to participants"; *and* (2) "defray reasonable expenses of administering the plan," if an alternative that achieves both purposes is available. (emphasis added). *See Rozo v. Principal Life Ins. Co.*, 48 F.4th 589, 593 (8th Cir. 2022) (stating fiduciary decisions must be made with "an eye single to the interests of the participants.").

28.      ERISA's duty of loyalty requires fiduciaries to act "solely in the interest of the [plan's] participants and beneficiaries." *Cunningham v. Cornell Univ.*, 145 Ct. 1020, 1025 (2025) (quoting 29 U.S.C. § 1104(a)(1)(A)). "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick By & Through Humrickhouse v. Travelers Ins.*

*Co.*, 93 F.3d 149, 154 (4th Cir. 1996) (citation omitted).

29.    Moreover, subsection (a)(1)(D) of 29 U.S.C. § 1104 makes explicit that the approach set forth above exists regardless of any terms of a written plan document that may be interpreted to the contrary, stating that the provisions of all plans must be "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104(a)(1)(D).

30.    This is also made explicit in ERISA's anti-inurement provision which prohibits employers from using plan assets for their own benefit. 29 U.S.C. § 1103(c)(1) provides in relevant part that, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose*s* of providing benefits to participants in the plan and their beneficiaries *and* defraying reasonable expenses of administering the plan."

31.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enables breaches by other fiduciaries. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

32.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.    The Impact of Fees on Defined Contribution Plans

33.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255 (2008). They have become America's retirement system. In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[1]

34.     The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only 11 of the Fortune 100 companies offered defined benefit plans to newly hired employees. In short, defined contribution plans have become America's retirement system.

35.     A fundamental difference between traditional pension plans and defined

---

[1] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, TOWERS WATSON RES. INSIDER, Oct. 2012.

contribution plans is that in the former, the employer's assets are at risk. Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks, and administrative and investment fees reduce their retirement assets.

36.     Each participant in a defined contribution plan has an individual account and directs plan contributions, both from the participant and from the matching contribution of her employer, into one or more investment alternatives in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). Expenses, such as those for plan administration, "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.* As the Supreme Court further clarified in *Hughes v. Northwestern University*, 595 U.S. 170, 177 (2022), ERISA's duty of prudence also requires ERISA plan fiduciaries to monitor plan expenses and, where necessary, to mitigate or minimize those plan expenses for the benefit of plan participants and beneficiaries.

37.     The fees of mutual funds and other investment alternatives are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1.0% of fund assets each year in fees, the fund's expense ratio would be 1.0%, or 100 basis points (i.e., "bps"). (One basis point is equal to 1/100th of one percent.) The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

38.     The plan's fiduciaries have control over these expenses and other expenses. For example, the fiduciaries are responsible for hiring service providers, such as recordkeepers, trustees, legal counsel, among others and negotiating and approving those service providers' fees

that are charged to the plan. Under ERISA, as set forth above, fiduciaries must make sure fees are reasonable.

39.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants can save for retirement. According to DOL, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement.[2] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[3]

40.     Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants only pay those expenses that are allowed and no more than a reasonable level of those allowable fees.

**B.    The Cigna Group 401(k) Savings Plan**

41.     The terms of the Plan are memorialized in a written document which was amended and restated effective January 1, 2025 ("Plan Document").

42.     In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund.

43.     The Plan is one of the larger retirement plans in the country. It currently ranks in the top 0.02% of over 700,000 retirement plans in terms of the number of participants and the top 0.01% of plans in terms of the value of its assets.

44.     As an individual account, defined contribution retirement plan, the Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of

---

[2] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf, *archived at* https://perma.cc/8KAR-W4JR.

[3] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees*, PLANSPONSOR (May 15, 2020) https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/.

accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

45.    Throughout the Class Period, the Plan has been funded by a combination of wage withholdings by Plan Participants and Company matching contributions, among other sources, each of which is deposited into the Plan's trust fund and allocated to individual Participant accounts.

46.    Throughout the Class Period, the terms of the Plan require the Company to make matching contributions to the Plan based on each Plan Participant's contributions.

47.    Upon their deposit into the Plan's trust fund, all Plan Participant contributions and Company contributions become assets of the Plan.

48.    Under the terms of the Plan, Plan Participants are immediately vested in their own contributions, as well as any actual earnings thereon and vested in Company matching contributions and any actual earnings on such amounts based on various schedules dependent on their employer group typically ranging from four to six years before being fully vested.

49.    To the extent a Plan Participant is not 100% vested upon termination of employment, the Plan Participant forfeits the value of Company contributions (hereafter "Forfeited Plan Assets") in their account on the earlier of the date the Participant takes a distribution of their vested interest in the Plan or the date the Plan Participant incurs a five-consecutive-year break in vesting service (within the meaning of the Plan Document).

**C.    Relevant Terms of the Plan Relating to Forfeited Plan Assets and Plan Expenses**

50.    With respect to the application of Forfeited Plan Assets, Section 8.3(b) provides as follows:

> Application of Forfeited Amounts. The amount in a Participant's Account which is forfeited in accordance with § 8.3(a)(1) shall, during the continuation of the Plan,

be applied towards the contributions made pursuant to §§ 3.4, 3.5 and 3.6. *To the extent the Participating Companies choose not to apply all or any portion of such forfeitures towards such contributions* and, instead, to contribute additional amounts to the Plan to fund such contributions, *any remaining forfeitures shall be used for* any permissible purpose, including but not limited to *the payment of reasonable Plan expenses* and/or the restoration of Account balances in accordance with §8.3(c).[4]

(emphasis added).

51.    Accordingly, the terms of the Plan give discretion to Plan Fiduciaries to act in compliance with ERISA with respect to determining whether to use Forfeited Plan Assets to reduce employer contributions or apply Forfeited Plan Assets to defray Plan expenses.[5]

52.    With respect to Plan expenses, the terms of the Plan provide that "[a]ll reasonable expenses necessary to operate and administer this Plan shall be borne by this Plan unless [Company] and/or other Participating Companies elect to pay them."

53.    Accordingly, when Company declined to pay for Plan expenses, the Plan Fiduciaries could choose between two alternative options with respect to the payment of Plan expenses. The first alternative would be to use Forfeited Plan Assets to defray at least a portion of Plan expenses consistent with ERISA's requirements and the discretion under the terms of the Plan

---

[4] In contrast, some plan sponsors take a different approach and do not give discretion to plan fiduciaries with respect to the use of Forfeited Plan Assets. For example, during the same approximate time as the Class Period alleged herein, one large plan sponsor had the following provision:

> Forfeitures will be used in the following order: (1) to be restored to a Participants' account following reemployment in accordance with the preceding paragraph; (2) to reduce employer contributions, including, but not limited to, future amounts contributed by the Employer or Employer Contributions and Matching Contributions; and (3) pay reasonable expenses of the Plan.

[5] It is worth noting that the Company also communicated to Plan Participants in the Summary Plan Description that it would use Forfeited Plan Assets to pay Plan expenses as directed and approved by the Plan Administrator (showing discretionary authority) prior to using Forfeited Plan Assets to reduce the cost of future Company matching contributions.

Document. The second alternative is to require the Plan Participants to pay for Plan expenses through deductions from their individual accounts.

54.     The Plan authorizes the Committee to be a "named fiduciary" within the meaning of ERISA with exclusive authority and discretion to control and manage the operation and administration of the Plan.

**D.     The Illegal Conduct and Use of Forfeited Plan Assets by Plan Fiduciaries**

55.     Throughout the Class Period, and continuing, Defendants directed and authorized tens of thousands of transactions, either directly or indirectly, extracting money from the Plan and/or accounts of Plan Participants to pay over $35,000,000 for Plan expenses to parties in interest including, but not necessarily limited to, Prudential Retirement Insurance and Annuity Company (PRIAC), Prudential Bank and Trust, Prudential Insurance Co., Empower Trust Company, and Mercer Investment, Inc.

56.     The transactions representing direct compensation paid by Plan Participants are memorialized in the statements received by each Plan Participant and are also memorialized in plan level accounting, e.g., a trust report of the Plan. For example, throughout the Class Period the accounts of each of the Plaintiffs were directly reduced by amounts withdrawn to pay plan administration fees.

57.     Moreover, throughout at least a portion of the Class Period, Defendants directed and authorized Plan Participants to pay at least one party in interest a currently indeterminable amount of indirect compensation to cover Plan expenses.[6]

---

[6] Defendants are solely in possession of the data and information to determine the accurate amounts.

58.    Defendants failed to act in accordance with the terms of the Plan Document and ERISA to direct the use of Forfeited Plan Assets to defray the fees that Defendants instead required the Plan and Plan Participants to pay through causing transactions from Plan Participants' individual accounts as well as transactions from the Plan to parties in interest.

59.    During the Class Period, under the terms of the Plan, Company owed the Plan more than $1.2B in matching contributions.

60.    Throughout the Class Period, Defendants also caused the Plan to engage in at least one transaction (and as many as 26 or more)[7] each year with a party in interest, i.e., Company, related to Company's contractual obligation to make matching contributions in excess of $1.2B to the Plan.[8]

---

[7] Defendants are solely in possession of the data and information to determine how many of these transactions involved calculations related to the use of Forfeited Plan Assets to offset Company's contractual obligations to the Plan.

[8] It is worth noting that ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that the deferrals of Plan Participants are promptly invested pursuant to the direction each Plan Participant and are not allowed to sit in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving Plan Participants from the potential for investment earnings. *See, e.g.,* DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); *see also* 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from plan assets); Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer."). Thus, to the extent that the Plan Fiduciaries caused Forfeited Plan Assets to sit in an unallocated plan-level account for a long period of time instead of using the Forfeited Plan Assets to immediately defray plan expenses *and* provide benefits, then that would be additional imprudent and disloyal conduct. *See*, e.g., IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service

61.    For each of these transactions during the Class Period, the Plan Fiduciaries coordinated with the recordkeeper and Company to calculate how much Company could reduce its obligation to make payments in excess of $1.2B to the Plan by more than $17M by offsetting the full amount owed with the use of more than $17M in Forfeited Plan Assets.

62.    In each of these instances, Defendants caused the Plan to engage in a transaction with Company that directly resulted in a smaller amount of money being paid by Company into the Plan.

63.    In other words, at least once each year, the Plan Fiduciaries engaged in calculations for the express purpose of calculating how to provide a benefit to Company by causing a transaction, which exchanged Forfeited Plan Assets for money owed by Company to the Plan.[9]

64.    As noted above, each of these transactions is also memorialized in Plan trust reports. Each of these transactions (i.e., Company's reduced contribution of Company assets plus the use of Forfeited Plan Assets) served to provide the assets necessary to execute tens of thousands of transactions to invest some combination of Company contributions and Forfeited Plan Assets pursuant to the investment instructions of Plan Participants.

65.    In other words, each of these transactions involves the receipt of Company contributions and calculations related to Forfeited Plan Assets to enable a combination of Forfeited

---

providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

[9] It is worth noting that "transactions" under 29 U.S.C. § 1106 are not limited to the use, transfer, or exchange of money that has not yet entered the plan trust. *See* Field Assistance Bulletin 2008-01 (stating an "employer continuing to hold participant contributions commingled with its general assets after the participant contributions reasonably could have been segregated will have engaged in a prohibited transaction in violation of ERISA section 406.).

Plan Assets and Company contributions to be combined for use in following the investment instructions of thousands of Plan Participants.

66.    As part of the same conduct, at least once a year, Defendants caused the Plan to engage in transactions that both directly and indirectly provided a benefit to a party in interest, i.e., Company, in the amount of Forfeited Plan Assets (and any interest earned thereon) used to reduce Company's contractual obligation to the Plan.

67.    In other words, throughout the Class Period, Plan Fiduciaries engaged in the conduct of making calculations that caused the Plan to receive at least $17,000,000 less in Company contributions than what the Company was obligated to make and which increased Company profits by at least $17,000,000.

68.    The Plan Fiduciaries engaged in this conduct for the primary purpose of providing a benefit to Company, and not, as required, for the exclusive purpose of providing retirement benefits to Plan Participants and defraying Plan expenses.

69.    Additionally, Defendants caused the Plan to engage in these transactions with Company that constituted and resulted in a use of Forfeited Plan Assets for the direct and indirect benefit of a party in interest, i.e., Company.

70.    During the Class Period, by directing, authorizing, and causing at least five transactions with Company and tens of thousands of transactions with Plan Participants, Defendants dealt with the Forfeited Plan Assets in their own individual interest and in Company's interest by using Forfeited Plan Assets to offset Company's contractual obligations to the Plan.

71.    During the Class Period, by directing, authorizing, and causing at least five hundred transactions with Company and tens of thousands of transactions with Plan Participants, the

individual Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, i.e., Company, whose interests are adverse to the Plan or Plan Participants.

72.     Throughout the Class Period, by directing, authorizing, and causing over one hundred transactions with Company and tens of thousands of transactions with Plan Participants, the individual Plan Fiduciaries received consideration for their own personal accounts from Company as a result of their control over the transactions described above with a party in interest, i.e., Company, involving the Forfeited Plan Assets, that enabled Company to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.[10]

73.     All Plan Participants, including Plaintiffs, have been harmed by the conduct of the Plan Fiduciaries. Defendants' failure to abide by the requirements of ERISA by failing to use Forfeited Plan Assets for the exclusive purpose of providing retirement benefits to Plan Participants *and* defraying plan expenses has caused the value of the accounts of all Plan Participants to be lower than they would be absent the illegal conduct of the Plan Fiduciaries.

74.     In other words, the use of Plan assets to pay Plan expenses from the accounts of Plan Participants reduces the funds available to Plan Participants for distribution and/or investing and deprives the Plan of funds that otherwise would have been earned on the amounts deducted.

75.     During the Class Period, Plan Fiduciaries disloyally and imprudently benefited Company by continuously prioritizing the use of Forfeited Plan Assets to reduce Company's required employer matching contribution obligations rather than using those Forfeited Plan Assets to pay Plan expenses both directly charged to Plan Participants' accounts as well as indirectly

---

[10] Individual Defendant Plan Fiduciaries are highly compensated employees of Company and often receive individual increased compensation and other benefits and bonuses as the profits of Company increase.

through indirect compensation paid to other parties in interest through the operating expense of investment options in the Plan.

76.     During the Class Period, the Plan paid direct and/or indirect compensation for services to administer the plan ranging from, among others, recordkeeping and information management, administration, accounting, consulting, loan processing, and investment management services. The Plan also paid other types of fees. Hereinafter the payment for services from Plan assets (directly or indirectly) shall collectively be referred to as "Administrative Expenses."

77.     The discretion given to the Plan Fiduciaries under the terms of the Plan and ERISA created a conflict of interest with respect to the Plan Fiduciaries' use of Forfeited Plan Assets. In other words, the Plan Fiduciaries' failure to allocate Forfeited Plan Assets to defray plan expenses benefited Company. All else being equal, had the Plan Fiduciaries followed ERISA and allocated the Forfeited Plan Assets to defray Plan expenses, Company's profits would have been lowered by more than $17,000,000 during the Class Period.

78.     In other words, if the Plan Fiduciaries had not used their discretion, despite having multiple other options available under the Plan and ERISA, to reduce employer contributions with plan assets, then *over $17,000,000 in additional assets would have been contributed to the Plan* and been able to be invested by the Plan Participants.

79.     The conflict of interest caused the Plan Fiduciaries to make their decision on the use of the Forfeited Plan Assets primarily in the interest of Company, and for the exclusive purpose of reducing the amount of money Company had to pay to fulfil its promise to the Plan to make non-elective matching contributions thereby adding millions of dollars to the bottom-line profit of Company.

80.     During the Class Period, the Plan Fiduciaries were motivated by self-interest and/or the interest of Company when failing to use unallocated Forfeited Plan Assets of over $17,000,000 to defray Plan expenses.

81.     There are no facts or circumstances throughout the Class Period that make the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce Company contributions consistent with discharging their duties with respect to the Plan *solely* in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; *and* (2) defraying reasonable expenses of administering the Plan.

82.     Contrary to the allegations of some, even if there is a risk that Company may be financially unable to satisfy its contribution obligations, defraying Plan expenses is the better option for Plan Participants. The impact to the account of a Plan Participant of using Forfeited Plan Assets to defray $1 of plan expenses that would otherwise be deducted from that Plan Participant's account is identical to a Company contribution of $1.

83.     Moreover, if Company were to declare bankruptcy, the Plan would have a claim against Company for the full value of Company's obligation to make matching contributions.[11] In many bankruptcy situations a Company may go through a reorganization and be able to make good on 100% of its obligations to the Plan. On the other hand, Plan Participants' assets that are used to pay Plan expenses will never be returned to the Plan Participants if the Company were to file bankruptcy.

84.     Thus, the Plan Fiduciaries' use of the Forfeited Plan Assets "to reduce" employer contributions is never in the best interest of Plan Participants, as Plan Participants then pay for all

---

[11] *See*, Field Assistance Bulletin 2008-01 stating ("when an employer fails to make a required contribution to a plan in accordance with the plan documents, the plan has a claim against the employer for the contribution, and that claim is an asset of the plan.").

the Plan's expenses out of their individual accounts, leaving Plan Participants with less assets for distribution or investment.

85.    Accordingly, the Plan Fiduciaries' use of Forfeited Plan Assets to pay Plan expenses is always the option that is better for Plan Participants compared to other alternatives.[12]

86.    Although ERISA requires Defendants to defray the Plan's expenses, *see* 29 U.S.C. § 1104(a)(1)(A)(ii), and although the Plan permits Defendants to use the Forfeited Plan Assets to pay Plan expenses, since 2019 Defendants have never used any Forfeited Plan Assets for that purpose.

87.    The Plan Fiduciaries were motivated by self-interest and/or the interest of Company when allocating Forfeited Plan Assets to offset Company's matching contributions instead of reducing the Plan Participants' Administrative Expenses or, alternatively failing to allocate the Forfeited Plan Assets back to the accounts of Plan Participants to be used to defray Forfeited Plan Assets, which reduced the value of both the Plan as a whole and the accounts of individual Plan Participants.

88.    In other words, contrary to the requirements of ERISA, to the extent that Defendants exercised their discretion, they exercised it solely for the exclusive purpose of reducing Company's matching contributions to the Plan, thereby saving Company millions of dollars at the expense of the Plan and Plan Participants.

89.    Consequently, throughout the Class Period, an objective analysis of the available options, guided solely in the interest of the participants and beneficiaries and for the exclusive

---

[12] There are several other reasons and alternative scenarios that illustrate that a prudent plan fiduciary acting for the exclusive purpose of providing retirement benefits to plan participants and defraying plan expenses would, after a prudent review of alternatives, conclude that using Forfeited Plan Assets to defray plan expenses is the best alternative for plan participants. In the interest of brevity Plaintiffs will not outline all of them herein.

purpose of providing benefits to participants and defraying reasonable expenses of administering the Plan would indisputably eliminate the option of reducing future employer contributions instead of using Forfeited Plan Assets to defray Administrative Expenses.

90.     Additionally, at all relevant times throughout the Class Period, it was administratively feasible to avoid holding Forfeited Plan Assets in an unallocated plan-level suspense account at the end of the year. Unallocated Forfeited Plan Assets are typically invested in a cash or cash equivalent investment option instead of being invested in the asset allocations chosen by Plan Participants. Failing to allocate the $2,627,254 in Forfeited Plan Assets that were unallocated and available at the end of each year during the Class Period prevented the Forfeited Plan Assets from being invested in the accounts of Plan Participants and prevented Plan participating in the opportunity for market gains.

91.     Accordingly, under the minimum standard of care under the circumstances then prevailing, a prudent Plan Fiduciary having the discretion to select among several options related to the allocation of Forfeited Plan Assets, acting solely in the interest of the Plan Participants and beneficiaries and for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the Plan, would choose options that would ensure that Forfeited Plan Assets were to allocated during the same year in which they arose and ensure that the Forfeited Plan Assets were used to both provide retirement benefits and defray Plan expenses.

92.     Additionally, that improper, disloyal, and imprudent exercise of discretion was in the best interest of Company because that option decreased Company's own contribution costs.

93.     Similarly, as described in detail above, throughout the Class Period, Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce employer contributions instead of

paying Plan expenses reduced the value of Plan assets and the accounts of Plan Participants and the benefits available to Plan Participants.

94.     As described in detail above, throughout the Class Period, the Plan Fiduciaries exercised discretion over, and control of, plan assets when directing the use of Plan Participants' accounts to pay Plan expenses to service providers.

95.     For example, during 2019, the terms of the Plan obligated Company to make contributions to the Plan in the amount of at least $160,528,630.

96.     During 2019, Plan Fiduciaries had the discretion and ability to require Company to make matching contributions in the amount of at least $160,528,630. Instead, Plan Fiduciaries allowed Company to offset its obligation to make contributions of at least $160,528,630 by allocating $900,000 of Forfeited Plan Assets towards Company's obligation under the terms of the Plan thereby saving $900,000 that flowed directly to Company's bottom line profit.

97.     Throughout 2019 the Plan Fiduciaries were required under the terms of the Plan and ERISA to direct and control the use of a minimum of approximately $900,000 in Forfeited Plan Assets.

98.     During 2019, instead of using the Forfeited Plan Assets to reduce Plan expenses, the Plan Fiduciaries caused Plan Participants to pay a minimum of $2,382,197 in Plan expenses through deductions from the accounts of Plan Participants and also caused Plan Participants to pay thousands of dollars in Administrative Expenses indirectly through revenue sharing or other similar methods (in other words, some of the Plan expenses were paid indirectly from the total operating expenses of the Plan's investment options).

99.     For the remainder of the Class Period, Defendants continued the same illegal, disloyal, imprudent, and prohibited conduct outlined in detail above in 2019, thereby causing similar additional losses to the Plan and Plan Participants.

100.    In other words, if the Plan Fiduciaries had not acted contrary to ERISA by failing to use their discretion (despite having multiple other options available under the Plan and ERISA) to defray Plan expenses with Forfeited Plan Assets, then a minimum of $14,178,870 (direct compensation paid for recordkeeping and administration services) in additional assets (during the Class Period) would have been contributed to the Plan and would have been invested by the Plan Participants.

101.    During the Class Period, Plan Fiduciaries improperly used their discretion with respect to Forfeited Plan Assets in a manner that benefited Company, a party in interest, by millions of dollars at the expense of the Plan and Plan Participants.

102.    As described in detail above, throughout the Class Period, Plan Fiduciaries improperly, disloyally and imprudently exercised discretion over, and control of, plan assets and consistently and reflexively chose to use Forfeited Plan Assets for the Company's interest, to the detriment of the Plan and Plan Participants, by allocating Forfeited Plan Assets toward reducing the Company's outstanding and unpaid contributions owing to the Plan.

## CLASS ACTION ALLEGATIONS

103.    Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

104.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions

on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all Plan Participants and beneficiaries of the Plan.

105.    Pursuant to Federal Rules of Civil Procedure 23, Plaintiffs bring this action on behalf of, and seek to certify and be appointed as representatives of, the following class (the "Class"):

> All participants in and beneficiaries to The Cigna Group 401(k) Savings Plan from June 10, 2019 through the date of judgment.

106.    Excluded from the Class are Defendants, any Plan Fiduciaries, and the Judge assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

107.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

108.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process. Plaintiffs believe, and on that basis allege, that tens of thousands of persons comprise the Class.

109.    **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan Participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.  whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

b.  whether Defendants were fiduciaries to the Plan under ERISA;

c.  whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

d.  whether the Plan and Plan Participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

e.  if so, the amount of damages or monetary relief that should be provided to the Plan and its Plan Participants;

f.  whether the Plan and its Plan Participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein; and

g.  whether fiduciaries of the Plan engage in prohibited transactions with Plan assets.

110.    Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

111.    **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the Class Period and all Plan Participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

112. **Adequacy:** Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of the Class that they seek to represent; they were participants in the Plan during the Class Period; and they are committed to vigorously representing the Class. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation—including ERISA and other complex financial class actions—and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

113. **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

114.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## COUNT I
## PROHIBITED TRANSACTIONS
### (29 U.S.C. § 1106(a)(1))
### (Against All Defendants)

115.    Plaintiffs restate, reallege, and incorporate by reference in Count I each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

116.    29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . exchange . . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

117.    Defendants are parties in interest, as that term is defined under 29 U.S.C. § 1002 (14), because they are Plan Fiduciaries and because Company is the employer of Plan Participants.

118.    When Defendants elected to use Forfeited Plan Assets as a substitute for future employer contributions to the Plan, thereby saving Company millions of dollars in contribution expenses, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

119.    As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Forfeited Plan Assets that were substituted for employer matching contributions and lost investment returns on those assets.

120.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore

to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

### COUNT II
### PROHIBITED TRANSACTIONS/SELF-DEALING
### (29 U.S.C. § 1106(b)(1-3))
### (Against All Defendants)

121.    Plaintiffs restate, reallege, and incorporate by reference in Count II each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

122.    29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

123.    Defendants were and continue to be Plan Fiduciaries. In their management and control of Forfeited Plan Assets, Defendants caused the Plan to use Plan assets (Forfeited Plan Assets) to fund Company's contractual obligation to make employer matching contributions to the Plan. By allocating these Plan assets toward offsetting Company's contribution obligations, Defendants saved Company millions of dollars in employer matching contribution expenses. Defendants therefore dealt with the assets of the Plan in their own interest or for Company's own account, in violation of 29 U.S.C. § 1106(b)(1).

124.    Additionally, Defendants in their individual capacity or as agents of Defendant Company acted in a transaction involving the Plan on behalf of a party (Defendant Company) whose interests are adverse to the interests of the Plan and the interests of Plan Participants and their beneficiaries in violation of 29 U.S.C. § 1106(b)(2) and received consideration for their own

personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan (Forfeited Plan Assets) in violation of 29 U.S.C. § 1106(b)(3).

125.    As a result of this prohibited conduct, Defendants caused the Plan and Plan Participants (the Class) to suffer losses in the amount of the Plan assets that were substituted for employer matching contributions and lost earnings on those assets.

126.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

**COUNT III**
**BREACH OF THE DUTY OF LOYALTY**
**(29 U.S.C. § 1104(a)(1)(A))**
**(Against All Defendants)**

127.    Plaintiffs restate, reallege, and incorporate by reference in Count III each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

128.    When exercising discretion and control over Forfeited Plan Assets and using them to reduce Company contributions, the Plan Fiduciaries considered the best interest of Company as opposed to Plan Participants, in violation of ERISA.

129.    Defendants, as affiliates and/or employees of the Company, had an omnipresent conflict of personal interest in decisions to serve the interests of the Plan Participants and beneficiaries versus the interests of the Company in decisions and actions to implement decisions regarding Forfeited Plan Assets. In exercising discretion and control over Forfeited Plan Assets and using them to reduce Company contributions, Defendants served the interest of Company and themselves at the expense of the interests of the Plan Participants and beneficiaries, in violation of ERISA and the Plan.

31

130.    As a direct and proximate result of Defendants' fiduciary breaches alleged herein, the Plan and the Class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

131.    Alternatively, when improperly exercising discretion and control over Forfeited Plan Assets and failing to use them to defray the reasonable costs of administering the Plan, the Plan Fiduciaries considered the best interests of Company, as opposed to Plan Participants, in violation of the explicit terms of the Plan Document as well as ERISA.

132.    When exercising control over Forfeited Plan Assets, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan Participants and beneficiaries *and for the exclusive purpose of providing benefits to Plan Participants* and their beneficiaries *and defraying reasonable expenses* of administering the plan, in violation of ERISA.

133.    As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

134.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to

lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed

to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant

is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

135.    Plaintiffs have suffered losses as a direct result of Defendants' breach of their duty

of loyalty.

**COUNT IV**
**BREACH OF THE DUTY OF PRUDENCE**
**(29 U.S.C. § 1104(a)(1)(B))**
**(Against All Defendants)**

136.    Plaintiffs restate, reallege, and incorporate by reference in Count IV each and every

allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

137.    When exercising control over Forfeited Plan Assets and using them to reduce

Company contributions, the Plan Fiduciaries failed to act with the care, skill, prudence, and

diligence under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with

like aims, when those aims are to act *solely* in the interest of the Plan Participants and beneficiaries

and for the exclusive purpose of providing benefits to Plan Participants and their beneficiaries and

defraying reasonable expenses of administering the plan, in violation of ERISA.

138.    Alternatively, when improperly exercising discretion and control over Forfeited

Plan Assets, and failing to use them first to defray the reasonable costs of administering the Plan,

contrary to the explicit terms of the Plan Document, the Plan Fiduciaries failed to act with the care,

skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims, when those aims are to act *solely* in the interest of the Plan

Participants and beneficiaries *and for the exclusive purpose of providing benefits to Plan*

33

*Participants* and their beneficiaries *and defraying reasonable expenses* of administering the plan, in violation of ERISA.

139.   When deciding how to allocate Forfeited Plan Assets, Defendants utilized an imprudent and flawed process. Despite the conflict of interest presented by alternatives under both ERISA and the Plan Document, Defendants failed to undertake any reasoned and impartial decision-making process to determine whether using the Forfeited Plan Assets to reduce the Company's own contribution expenses, as opposed paying Plan expenses or for other purposes allowable under ERISA, was in the best interest of the Plan Participants or was prudent, and failed to ***solely*** consider which alternative *would promote the exclusive purpose of providing benefits to Plan Participants and their beneficiaries and defraying reasonable expenses of administering the plan, in violation of ERISA.*

140.   By refusing to use Forfeited Plan Assets to eliminate Plan expenses that were instead charged to Plan Participants' accounts, and instead deciding to use these Plan assets to reduce the Company's own contribution expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan expenses.

141.   Had Defendants conformed with the minimum standard of care required under ERISA, Defendants (Plan Fiduciaries) would not have used Forfeited Plan Assets to reduce Company contributions.

142.   Alternatively, had Defendants conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan.

143.    Plaintiffs have suffered losses as a direct result of the Defendants' breach of their duty of prudence.

**COUNT V**
**BREACH OF ERISA'S ANTI-INUREMENT PROVISION**
**(29 U.S.C. § 1103(c)(1))**
**(Against All Defendants)**

144.    Plaintiffs restate, reallege, and incorporate by reference in Count V each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

145.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

146.    Defendants failed to use Plan assets to benefit Plan Participants by reducing or eliminating Plan administrative expenses. Instead, Defendants chose to benefit themselves by reducing the Company's obligation to pay its contractually imposed employer matching contributions. By decreasing the Company's out-of-pocket costs to make its contractually imposed matching contributions, the Company saved millions of dollars each year at the expense and to the detriment of the Plan and its Plan Participants. As a result, Defendants caused the assets of the Plan to inure directly to the benefit of the Company directly at the expense and to the detriment of Plaintiffs.

147.    By reason of the foregoing, Defendants violated 29 U.S.C. § 1103(c)(1).

148.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

## COUNT VI
## FAILURE TO MONITOR FIDUCIARIES
### (29 U.S.C. § 1104(a)(1)(A))
### (Against All Defendants)

149.    Plaintiffs restate, reallege, and incorporate by reference in Count VI each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

150.    Defendants' fiduciary responsibility for overseeing the Plan included monitoring all other fiduciaries appointed or hired to manage the Plan on a quotidian basis, including the day-to-day responsibility of safeguarding and prudently directing the usage, transfer, and movement, of Plan assets, including the Forfeited Plan Assets.

151.    A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are discharging those duties as ERISA's strict fiduciary standards mandate. In particular, the Company remained responsible as an appointing fiduciary to monitor the actions of the Committee to ensure that it carried out its fiduciary obligations loyally and prudently. The Company, as the Plan's sponsor and named fiduciary, and through its delegation of authority to the Committee, the Plan's administrator and also a named fiduciary, remained responsible for monitoring the actions of the Committee, and all other Plan Fiduciaries, with respect to safeguarding and prudently directing the usage, transfer, and movement of Plan assets, including the Forfeited Plan Assets.

136.    Defendants violated their fiduciary monitoring duties by failing to ensure, among other things, that their fiduciary delegees' actions with respect to Plan assets, including the Forfeited Plan Assets, (1) complied with the terms of the Plan Document, (2) were not disloyal, (3) were not imprudent, (4) did not inure to the benefit of any Defendant, and (5) were not transactions prohibited by ERISA.

152.    Had Defendants adequately discharged their fiduciary monitoring duties, Defendants (1) would have used the Forfeited Plan Assets to pay all the Plan's administrative expenses during each year of the Class Period and (2) would not have used the Forfeited Plan Assets to reduce the Company's employer contributions in any year during the Class Period.

153.    Had Defendants adequately discharged their fiduciary monitoring duties, the Plan would not have been harmed because (1) the value of Plaintiffs' retirement accounts would not have been adversely impacted, and (2) Plaintiffs would not have been injured.

154.    As a direct and proximate result of Defendants' failure to discharge their fiduciary monitoring duties adequately, Plaintiffs have been injured.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of the Plan and all similarly situated Plan Participants and beneficiaries, respectfully requests that the Court:

A.    find and declare that Defendants have breached their fiduciary duty to follow the terms of the Plan Document, breached their fiduciary duties, and engaged in prohibited conduct and transactions as described above;

B.    find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

C.    order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

D.    Order the restoration of assets and profits secured by Defendants as a result of each violation of ERISA described above into the Plan and the Plan Participant's individual accounts;

E.    determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;

F.    order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a), including bringing forward calculations of losses on the conduct of Defendants throughout the Class Period;

G.    remove the Plan Fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

H.    surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

I.    certify the class, appoint Plaintiffs as a class representatives, and appoint The Sharman Law Firm LLC and Ahdoot & Wolfson, P.C. as class counsel;

J.    award attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) or otherwise allowed by law;

K.    order the payment of interest to the extent it is allowed by law; and

L.    grant other equitable or remedial relief as the Court deems appropriate.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable in this action.

Dated:  June 10, 2025                              Respectfully submitted,

*/s/ Andrew W. Ferich*
Andrew W. Ferich (PA I.D. 313696)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

Paul J. Sharman (*pro hac vice* forthcoming)
**THE SHARMAN LAW FIRM LLC**
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Telephone: (678) 242-5297
Facsimile: (678) 802-2129
paul@sharman-law.com

*Counsel for Plaintiffs and the Putative Class*